THOMAS H. SHELBY'S EX'RS *v.* MARY P. SHELBY, ET AL.

**Trusts—Acceptance of Trust.**

Where an express trust is created for the benefit of persons named and the instrument creating it is delivered to a third person as trustee, who collects some of the notes, this will amount to an acceptance of the trust.

**Acceptance of Trust.**

A trustee who accepts a trust for the benefit of others cannot claim any interest in the trust property except for the purposes of the trust. He cannot be permitted to assert a personal interest in the trust funds adverse to that of the beneficiaries of the trust.

APPEAL FROM FAYETTE CIRCUIT COURT.

April 6, 1877.

OPINION BY JUDGE PRYOR:

By the stipulations of the writing executed by Isaac Shelby on the 18th day of November, 1860, an express trust was created in favor of the two Mary Pindel Shelbys, and when delivered to Grinstead it was a complete instrument. It must be presumed that it was delivered to him for the trustee, and the collection of the notes, or a part of them, after the delivery to Grinstead, by Shelby, was an acceptance of the trust, and an undertaking on the part of the latter to hold the notes upon the conditions contained in the writing creating it.

The argument is, there was never an acceptance of the trust, for the reason that Mat Shelby was ignorant of the fact that the parties now claiming were the real beneficiaries. That it was the purpose of Isaac Shelby to secure his surety in his liability on the bond we have but little doubt, and are equally as well satisfied that it was his like purpose to indemnify his wards by depositing with Mat Shelby, as trustee for their benefit, the notes and claims in controversy. These claims amounted to a much larger sum of money than the lia-

bility of the surety, and the guardian as well, as his attorney, must have seen that by securing the wards he at the same time indemnified the surety. The guardian had promised the surety to indemnify him, and when executing the trust complied fully with this promise. The language used in the writing has no ambiguous meaning. It was written by an attorney and read to the party executing it, and if the sole purpose was to secure Mat Shelby in his liability regardless of the rights of the infants, it is difficult to see how such a mistake could have occurred. The surety was not present, it was time to dictate the character of the instrument to be drafted, and the guardian, selecting his own mode of saving his surety harmless, saw proper to create the trust, and when he informed Mat Shelby that this had been accomplished, was making a statement in every way sustained by the writing he had executed. The security was secured so far as the guardian had the ability to do it, and we see nothing inconsistent with the promise to the surety, and the writing evidencing the security given.

There could not have been an understanding, when the compromise was made, that Mat Shelby was to reimburse himself out of the assets placed at Grinstead's. Neither the ward, guardian nor the attorney were apprised at that time of the existence of this trust, and therefore could not have made such an agreement. If the terms of the trust had been known to·Ingles or the attorney, it is not to be presumed that they would have compromised with the surety, fixing the sum at $6,200, and then surrendered to him the means of the ward out of which to pay it. The ward, by her guardian, was asserting her right to recover the whole $16,000. It was a matter of doubt, certainly, with the parties at the time as to the extent of his liability. It was at least claimed by Ingles that Mat Shelby was liable for the default of the guardian prior to the date of the execution of the last bond, and although such a liability may not have existed in fact, it was certainly no compromise if the money to be paid by Mat Shelby was to be obtained from the proceeds of the notes to which the ward, by the terms of the trust, was clearly entitled. The compromise may have been made by the surety, and no doubt was, under the belief that he had already obtained indemnity. In this he was mistaken. He had access to the notes and the paper clothing him with the right to control them. He should have renounced the trust or disclaimed at once to act as trustee, and could not hold under such an instrument the property passed by it for his own benefit.

27

The action of the trustee, with reference to this property, has been entirely consistent with his trust. He has done or said nothing evidencing an intention to renounce the trust, but on the contrary has accepted it by taking possession of and controling the fund. Judge Kinkead says that he was informed by Mat Shelby that he had been indemnified, and that Payne, one of the counsel for the ward, suggested that the surety was in no danger on that account. But neither Judge Kinkead nor Payne knew the contents of the writing at Grinstead's, but were both relying on the statement of Mat Shelby that he had been secured by his brother. The mistaken belief of Mat Shelby affords no ground for reforming the writing. He had every means of knowing the manner in which he was secured, and we have already seen that there could have been no mutual mistake, as Isaac Shelby must have known the manner in which his brother had been secured. Such a writing could not have been written by an attorney and read to an intelligent client without both fully understanding what was in it.

The statements of Judge Kinkead and young Shelby are entirely consistent with this view of the case. In the answers of Mat Shelby filed in the case it is not pretended that any agreement was made at the date of the compromise by which he was to have a certain sum to be realized out of the notes, and therefore the entry in the judgment that Mat had been paid by Isaac could not have been the result of such an agreement. The answer of his executors is not sustained in this regard, for the additional reason that the guardian of the ward did not then know that such a trust was in existence. The answer of Mat Shelby is that he accepted the deposit for his own indemnity. This, as we have already adjudged, he could not do without in some way surrendering the trust or refusing to accept it. He will not, as trustee, be allowed to accept in such a way, so as to affect the claims of those beneficially interested.

The claim in controversy was properly the subject of compromise, and when entered into, without any unfair dealing with those with whom Mat Shelby treated the consideration, was sufficient to uphold it, and if he were mistaken as to the purposes of his brother, or as to the existence of facts that might have influenced a different course of conduct, if known by him at the time, it is to be attributed to his own action, and he is without remedy. This trust was created before any compromise was made.

The suit of Mary Pindel Shelby was instituted in the year 1860, and no exhibition was made of the trust instrument until the year

1863. Then it was that the appellee was informed of its contents for the first time. This acquiescence on the part of Mat Shelby, with the actual control of the notes and the collection of them, certainly does not evidence an intention to reject the trust, and although he may have been ignorant of the contents of the writing, he had access to the papers for more than two years and should have known the character of his holding, and the chancellor will not now seize upon such laches on his part for the purpose of relieving him from responsibility.

It is no doubt true that he never read the paper; still he will not be allowed to say, after using and controlling the trust fund for so long a time, with the evidences of the trust before him, that he was not aware of its existence.

There was no transfer of the notes for the benefit of James Shelby or his estate for whom Isaac Shelby had been acting as guardian. James Shelby was dead at the date of the transfer to Mat Shelby, and Isaac Shelby, who had been acting as his guardian, and knew the interest his half sister had acquired in his estate, was desirous of securing her. The debt he owed her originated from his fiduciary relation to her half-brother, and it was this that caused the transfer to her. There is no doubt but that the transfer was made, and the consideration or motives influencing him was to secure this liability to her. There is no transfer to Mat Shelby except as trustee, and looking to the manner in which the trust was created and the language used it is unreasonable to conclude that the maker intended to transfer the notes for the individual benefit of his surety. The fact that he makes the claimant a beneficiary is one of the strongest circumstances in the case indicating his purpose to make the transfer as it appears. If the primary object were to secure Mat Shelby as the surety of the Kentucky Mary P. Shelby, it is singular that he would omit to make any mention of the fact that Mat Shelby was first to be indemnified. He was not surety on James Shelby's bond and there could have been no reason for giving her, the Missouri beneficiary, preference unless such was his purpose. As she is a beneficiary in express terms, why she was made so, and the liability or motives inducing it, are the proper subjects of inquiry. Myron and wife have no claim on the fund. It was not transferred to either or the estate they represent.

The court below erred in apportioning the proceeds of the trust fund between the beneficiaries. Their rights vested at the date of the delivery to Grinstead. Isaac Shelby never assumed any control

of the fund after that time. The liability to each of the beneficiaries as of that date should constitute the basis of distribution. One-half of the debt owing by Isaac Shelby as guardian of James Shelby is the sum by which Mrs. Napton's pro rata is to be ascertained. In ascertaining the amount to pay Mary P. Shelby (Kentucky), the commissioner will be directed to report the entire debt due her by Isaac Shelby as guardian when the assignment was made; in other words the pro rata is to be determined by the amount due to each by Isaac Shelby at the date of the assignment. If the other property to which appellee, Mary P. Shelby, is entitled, was sufficient to pay her, other questions might arise, but it is conceded that such is not the case. *Logan v. Anderson,* 18 B. Mon. 114; *German Security Bank v. Jefferson,* 10 Bush 326.

As to the power of the county court to release the surety on the guardian's bond, we regard the question as settled by the repeated adjudications of this court, some of them rendered prior to the date of the bond given in this case. While the court might have rendered judgment on the whole case, so far as Mary Napton was concerned, we are not disposed to reverse because of the reference back to the commissioner. Under the agreement of the parties in this case signed by counsel, the rights of all the parties are to be determined as if they were properly before the court by cross-appeal. The original judgment is *reversed* on the cross-appeal of Mary P. Shelby against Mary Napton, and *affirmed* as to all others both on the original and cross-appeals. The case is remanded for further proceedings consistent with this opinion.

*Kinkead & Duvall, R. A. Buckner, M. C. Johnson, for appellants.*

*Breckenridge & Buckner, J. O. Harrison, John B. Houston, for appellees.*